Good morning, Your Honor. Timothy Coates on behalf of the appellants Ian Grimes, Arthur Frank, and City of Glendale. This case arises from a judgment for wrongful arrest and malicious prosecution under the Fourth Amendment. I've had the benefit of extensive briefing and opening and a reply, and I'll repeat what I have in there. But in sum total, our point is that we believe that the officers had probable cause for the arrest, that there was probable cause for the prosecution, or at least they could, under the associate case, have qualified immunity for reasonably believing that there was probable cause. The central theme of the plaintiff's case was with respect to Carmen Shanzari's identification or statements concerning Mr. Ovasapyan the day that he was arrested. This was a photo lineup. Well, you used the word identification, and there wasn't one. Well, even the plaintiff's attorney under oath said reasonable minds could differ as to whether it was an identification. It was a statement. Their point is -- Well, I'm speaking for myself. It was not an identification. She said umpteen times, that's not the guy. But, Your Honor, there are no magic words. I know what happened, but she kept saying, that's not the guy. Absolutely. That's your basic problem. Absolutely. But the officers can't take that as an incantation. If she said, that's the guy, and her identification was completely different than the description she gave the suspect earlier. Say she initially identifies him as Hispanic or African American, and then there's a photo ID. She says, that's the guy, and he's clearly Caucasian. I don't think anyone would say the officers could reasonably take the second one as an identification. The Brodniki case, which we cite in the brief, talks about you look at all the facts surrounding the identification. This isn't one where she got the photo ID and said, it doesn't look anything like him. I think that's critical here. Well, wait. I don't understand that argument. Are you saying it's because it was the same ethnicity? No. Her point was -- No, wait. What was the point of your last argument? I just didn't follow. That if you had, say, a suspect, a witness identifies a suspect at the scene, says this guy is African American, had a good view of him, clearly African American. You later take into a photo lineup in which you have the person identifies a Caucasian suspect. Correct. Uses the magic words. This is the guy. I don't think anyone would say that the latter identification officer would be dead bang correct in relying on it. Why? Because the circumstances surrounding the identification is so at odds with the initial one. You know, your argument, I'm just getting lost in your argument. You're trying to bring in all kinds of extraneous stuff that has nothing to do with this case. You just ought to accept the fact that she kept saying this is not the guy. And what you really should be saying is that's not dispositive because of everything else she said. It's exactly like him, everything like him. I don't know. That's the next point to get to, is that it wasn't an identification. It wasn't a statement in isolation because her grounds were saying it wasn't him. She says it looks exactly like him, same hair. The only thing is the guy who came to the door was younger. Again, this wasn't just pulled right out of the air. The officers looked at that. They then had his driver's license photo, and they looked at it after they got Mr. Ovasapien, and they realized that he looked younger than the photo from which she had made the identification. I don't think that's entirely unreasonable because a lot of us don't look exactly like we do in our driver's license.  I guess I can't get over the fact, and I've never been a police officer, but we have to look at it objectively, that she kept saying this is not the guy. This looks like the guy, but this is not the guy. And she even said the guy looks familiar, and he could have looked familiar to her from the other contacts that she thought she knew him from, but she kept saying this is not the guy. How do you turn that into probable cause? Because, again, the context of the statement was the same hair, same face, everything. It's just that the guy who was here this morning was younger. And when the officers got Mr. Ovasapien in and they looked at him, they said he does look younger than this photo. Plus the fact that he had been involved in tile work plus the car. That's right. That's pretty much what you have. Except they got the car wrong, right? They got the Honda wrong. Well, it was a black Honda. I think they're talking about on the McLaughlin probable cause determinations that it was a Honda Accord. At the time they brought him in, they knew he had connection to a black Honda. At the time he was arrested. But they added the Accord into the report. They added the Accord. It got into the probable cause determination later, the McLaughlin. They added that in. That was something that they created as well. But at the time he was arrested, there was a black Honda. He had been identified as the person who had done tile work there. And they had his photograph, his driver's license photo, which they believed did look older than he looked in person. What about his alibi? His alibi, number one, if the officers have probable cause, they don't have to examine the alibi. That's the drawing piece. But they do at the next step. The next step. None of the alibi evidence here really exonerated Mr. Ovasavian. He has the cell phone record and puts his cell phone at the Heffron residence. But no one says that they spoke with him. He doesn't even say that he spoke with someone at the time of the murder. That really doesn't tell you anything other than his phone was at the Heffron residence. He has the Home Depot photo. But that was taken an hour after the murder. He has the statement of his cousin. But his cousin, if anything, doesn't put him with him at the time that the murder was committed. What would it have taken for the police to say, oh, gee, I think we have the wrong guy? I guess what it seems to me is that she didn't identify him. And they arrested him anyway. And now everything that contradicts that they have the right guy, they find a way of explaining around it. Well, they don't have to accept it. I think, like I said, if there's probable cause based on what we consider Carmen's statement and identification. And, again, note that plaintiff's own counsel said reasonable minds could differ because of the statement, the circumstances surrounding the statement. The counsel's statement, do you say he said it under oath? That's not evidence, is it? Well, I think it goes a long way towards showing what common sense says here. Which is, again, this isn't a woman who says this doesn't look anything like the guy. Well, actually, isn't this a jury question? Wasn't it a jury question? No. I don't believe it is because the facts aren't disputed about what the officers knew and when they knew it. I mean, I think legal inferences can be drawn from those facts. Well, speaking for myself, I don't think the officers had probable cause to arrest him, period. Okay. The question in my mind is whether under qualified immunity this was the kind of mistake that was reasonable under the circumstances or whether these people were simply plainly incompetent. I don't think they were deliberately trying to break the law, but were they plainly incompetent or was this a reasonable mistake that they could make under the circumstances? I believe it's reasonable because, again, the circumstances surrounding the statement. They didn't pull this guy out of a hat. She had previously identified a particular individual. That's how Mr. Ovasapien was identified by the police officers and put in the lineup to begin with his photo is because they followed up with her son Savon. He identified, well, the guy who did the tile was Edmond Ovasapien. They pulled his photo. They put it in the six-pack. They brought it to Carmen. Carmen looked at it. And, again, I agree. She said it's not him, it's not him, but she didn't say it doesn't look anything like him. She was very specific. No, same hair, same face. The face, everything has looked like him exactly, everything, but it was not him. But it was not him. You know, everything was fast. Yeah, but this looks like him, not him. I don't know. Yeah. Could I ask you another about Alibi? The Mr. Ovasapien was interviewed before he was arrested, right? Correct. And he told them that he claimed Alibi. He told them that he was not there, he was working with his cousin at an address. Correct. And they arrested him around November of that, I mean around 11 p.m. on the day of the murder. Correct. Arrested him within six hours or so of the murder, did they not? And they had been told by Ovasapien that he had an Alibi. Correct. But they hadn't talked with the cousin until the next day. Correct. Now, at the time that they arrested him at 11 o'clock, as I understand it, he had been detained initially because he had a couple of warrants. Correct. Misdemeanor warrants. Yeah, failure case. And they were afraid that he would bail out on those warrants, and they arrested him at 11 o'clock. Isn't it possible that they could have just put a detainer on him for investigation? Can't the police detain for investigation without arresting? That's done all the time, isn't it? Well, I have not. Yes or no? Your Honor, I've had so many of those cases that ripen into the question whether they're arrested or not that I don't believe you probably could. No. I'm asking this question. Can you detain somebody for investigation without arresting them? The police can detain without arresting. Temporary. A basic temporary detention. Temporary. But they can't, if he wants to leave, they can't. If they hold him, it's a Fourth Amendment seizure. Well, I mean, that's not right. That's not right. You can investigate if you have a suspicious, you have reasonable suspicion, so you detain somebody until you check it out. Now, my question is this. Why couldn't they have simply kept him under that warrant and put a hold on him, can't be released because he's under investigation, until they call the cousin and bring him in and get some more information on this alibi? They had no reason to rush out quickly and at 11 p.m. with already a detainer on the man, and they could have extended that for 48 or 72 hours until he could be brought before a magistrate. But they got an opportunity under the law to investigate, and they didn't have to arrest him. Is that a factor we should consider in deciding whether the officer acted reasonably? No, because this Court held in the John case, the question is whether they have probable cause or could reasonably believe they have probable cause. It might be better for them to do additional investigation. The John case is a perfect example. Serious crime, child abuse allegation by a teacher, only one witness, it was the child. And this Court said, you know what, the officer probably arrested precipitously, probably out of malice, whatever, but he had probable cause. It would have been better for them to do further investigation, but that's not what the Fourth Amendment requires. If there's probable cause, they can arrest him. If they could reasonably believe there's probable cause, they're entitled to qualified immunity. It might be preferable to do additional investigation, but under the Fourth Amendment, they're not required to if they have probable cause. Procedurally, did you make a motion for a qualified immunity? A Rule 50 motion. Right. Well, did you make an earlier motion for summary judgment based on the law? I believe there was a motion for summary judgment. Okay. On the basis of qualified immunity. I believe so. Okay. Well, you believe so or there was. I mean, I get hurt. We haven't reviewed that. We haven't taken an appeal from that. We're appealing from the denial of Rule 50.  That's going to my question.  Okay. So you can just help me out by answering yes or no on the facts. So you – but the reason you couldn't take an appeal from the denial of qualified immunity was that Judge Schneider denied your motion for qualified immunity because there were genuine issues of material fact as to whether the officers acted objectively, reasonably. Isn't that right? And there's no appeal from that when she finds genuine issues. If she does it on a factual basis, but – But she did, didn't she? I mean, that was the ruling, wasn't it? I don't know. I have not been involved in the evaluation of whether to appeal that or not. I have had judges deny qualified immunity on factual issues. Are you familiar with the record? I am familiar. Okay. So this – I'm going to – what standard of review do we apply? Are we applying de novo or are we applying the standard of review that we apply to judgment as a matter of law? It must be as judgment as a matter of law, taking every factual inference in favor of the plaintiff if there are conflicting facts. Right. So taking every factual inference in favor of the plaintiff, how can we not roll against you on that? I mean, that's a different standard of review than de novo for qualified immunity. Well, because when the facts are undisputed about what the officers knew and when they knew it, I think they're not in dispute here. What we're arguing about is the legal effect of those facts and whether an officer on the law can reasonably believe that constitutes probable cause. Well, did that issue go to the jury? You see, there are two different issues that might have gone to the jury. The first one, did they have probable cause? The answer to that was no. Did they also decide that the – on the qualified immunity issue of fact, which is different. Look, there's no instruction on qualified immunity in this circuit. You don't submit qualified immunity to the jury. No, but you submit the factual issues that are underlying it, and it's more than just did they have probable cause. You said they reasonably believed they had probable cause even though they didn't. My point to the Court is what is the factual dispute that goes to the jury in terms of the qualified immunity aspect? We know what the officers knew and when they knew it. Either it's reasonable for them to believe that's probable cause as a legal determination or it's not. I just – there's nothing the jury's deciding with respect to the qualified immunity aspect because we haven't identified a conflicting issue of fact. Everyone kind of agrees on what the officers knew. And they argue it's unreasonable or it's reasonable, but I don't think there's any dispute about the – what facts they had at the time they arrested Mr. Opus Abe. So with that, the only other thing I note again for purposes of malicious prosecution, we have a second identification by Ms. Shanzari. That's probable cause determined at a second level for purposes of malicious prosecution. That identification is made from his booking photo. It's a recent photo. She identified him. That's sufficient. We have to submit for probable cause. And I would submit – I would like to reserve the balance of my time for about all. All right. Thank you, counsel. Thank you. Good morning. Pat Harris on behalf of Edmond Olisapian. May it please the Court. The argument that has continued to be made by the defense is that this was a – there is no discrepancy in the facts. This is a legal question. This Court has already determined that it's not true. A specific case in Torres, which goes directly to an identification where there was a question or not whether there was an identification, this Court stated that it is a factual issue to be determined by a jury. When they keep arguing over and over and over that there is no dispute, it's said in the transcript. But what actually occurred in the interpretation is a factual issue. That has been determined by this Court. It's been repeated in three separate cases, Blankenhorn, Torres, and addition Lalonde. This Court has said not only is it a factual issue, but if inferences that could be made from those type of facts are also jury issues. So to begin with, I think the probable cause issue clearly was a jury issue and the jury, we believe, decided it. This was not a case, as has been repeatedly stated, of misidentifying a witness. The Court has asked the questions as to whether or not the fact that she stated exactly it's him, whether or not that is identification. There is a witness who made the exact right statement. That witness was a Glendale police officer, Detective Irvin. When asked and given the opportunity, he was called by the defense in this case. He was put on the stand and when given the opportunity by me in questioning to say there was probable cause or there was an identification, he pointedly chose not to. He said specifically it was useful information. He also then said could have been, couldn't have been. In addition, the judge in this case, Justice Schneider, she stated at the very best it was an equivocal identification, at its best. Clearly, we believe there is no identification, there is a factual issue here, and that's what went to the jury and that's what was decided. Now, as far as the qualified immunity that's been discussed, I would tell the court that first and foremost, as the court is aware, it goes to the totality of the circumstances in the beginning at the time of arrest. What we know at the time of arrest, what was known, was there was a black Honda and Edmund Ovasopian drove a black Honda. I'll grant them that. However, I would argue, interestingly enough, only one person saw the black Honda. Three witnesses, including the victim's mother. The victim's mother stated it was actually a gray Tundra, told the police that, and maybe a white car. She didn't see a black Accord at all. One of the next-door neighbors said there was a black Honda that left the scene at the same time. That's the witness. Exactly what did she tell the police about the tile worker and the connection between a tile worker and the robbery? What she told the police was. And I want you to be exact, not to just paraphrase or spin. What she told the police was is that she had, she sort of recalled. That's her words, I sort of recall? I can't say that sort of is exactly, but it was, I recall that there was a gentleman, well, she prefaced it by saying, a lot of young kids come to my house all the time. There was a tile worker who looked like the first person who she described as tiny. There was a tile worker who looked like that, who did some work at her salon. She then said specifically, it looked like that gentleman. Then she said, I don't know, though. And she followed that up by saying, I don't know. So that's what she told the police before the photographic lineup. Yes. That's correct. But why wouldn't that be probable cause? Because, in essence, what happened is she sees the actual photograph of the person and tells them. She says it looks exactly like him. She says it's not him five different times. And she doesn't say it's interesting the way she phrases it. When she goes through her actual statement, the very first thing is she says, he looks familiar, but it's not that guy. Then they start questioning him. They question him because she says number two looks familiar on the site. Well, of course he looks familiar. That was the question asked. He was the person who did the tile work. So they start questioning. And as the transcript follows, and as you go through the transcript, she does at one point say, well, he does. Why not? Well, he does look younger. Or this person looks older. Then they continue to ask her. They continue to hit on that and hit on that. Repeatedly she says it's not him. Then again, a second time they say, what's different? She says, well, he appears to be older. The guy just looks younger. Is that what you're saying? Yes. Yes. That's the second time. But she's telling them, no, no, there is nothing here. No, this is not him. I jokingly told a jury, we're in a situation where I get told three times a month. I get stopped and people will say, you look like Joe Biden. No one thinks I am Joe Biden. We say that all the time. It's a phrase people use. I'm sure you've all used it at different times. Oh, that person looks like so-and-so. I'm just wondering, it's sort of underlying all this, but this was obviously an Armenian community in Glendale. Yes. Correct? That's correct. I think a counsel for the city of Glendale started to make an argument along these lines, but there are certain common features that might be confused. I'm sure this was also a very sensational crime at the time because that's considered a very safe community. That's correct. Was any of those arguments made to the jury? Any of the arguments that she may have been mistaken because the Armenian features tend to be similar? And or that the police might have been rushing to arrest someone because of the sensationalism of the crime in this community that's very close-knit. Well, I think that's exactly. Yes, we made the argument. That's exactly what we believe. I think Justice Trott stated you're saying it's incompetence or you're saying it's purposeful. We think it's in between. What we believe is is essentially. Did you argue this to the jury? Yes, we did. Okay. We did. What we argued to the jury specifically was Detective Grimes blurted out probably accidentally that the reason they kept him was an improper purpose, i.e., because he was going to bond out. That's an improper purpose to keep him, and it's been pointed out he could have actually been held. He could have been detained. In addition to that, they could have gone to court the next day and stated to ask the prosecutor to have him held on the failure to appear on a no warrant so he had been kept in jail that way. There were numerous things they could have done. They could have actually released him and trailed him. The investigation could have continued. What happened here was is they made the decision because they didn't want to see him bailed out, which is an improper purpose. Unfortunately, for whatever reason, the police department then put out a big news article saying we've arrested the killer. It's a situation where now they have to make sure. Is that the next day? Now it's embarrassing. That was the next day, right? It was the very next day, yes. That article's in the record, right? Yes. And it becomes very embarrassing now because now they've picked up somebody and now they've got to find the proof. They've got to go do the investigation. I'm very sure for Detective Grimes and Detective Frank their necks are on the line now. They've arrested somebody. It's now in the paper. Mr. Elvasapien has now been accused of murder. And everything from that point on, all the evidence that comes in, as was pointed out by the justices here, they just start justifying it. They start making up excuses to why it doesn't matter. Specifically the cell phone, which is obviously something we used a lot in trial. It's not just that the cell phone was found. There was an 85-second phone call that day at the time approximately of the murder. It wasn't just the phone was left there. There was an 85-second phone call. What this means is somebody is talking on that phone. What we know is the phone call came from the guy who employed him, Mr. Orofale. He was employing him on this job. What Detective Frank did was go, say to Mr. Orofale, did you call? He said, I don't remember, which Detective Frank then put in. He said he didn't do it, which was incorrect. But he said, I didn't remember. Instead of following up with anybody else that worked for Mr. Orofale, because the facts are there. The cell phone records show a call was made. But instead of asking anyone else and saying, did somebody else at your company, he just walked away. And instead said, well, he could have, in effect, left the phone there, and he may have done it on purpose because he knew he was going to this house to commit a heinous crime. That in itself is incorrect because, as we know from the evidence, it appears that the home invasion was not even an attempt at a murder. It was just to try and collect on a debt, apparently, which the police knew. Okay. So do you agree with the City of Glendale's counsel on the correct standard of review that we review under the JMOL standard? Yes. Okay. Do you want to address your argument about the abuse of discretion in disallowing the evidence of indemnification of the police officers? Certainly. In terms of the punitive phase? Well, yes. I mean, that's your cross-appeal, right? Yes, it is our cross-appeal. You have four minutes left, five minutes left. Our position was, as our understanding of the Ninth Circuit law, was that obviously we can't put into evidence that the city is going to cover and indemnify the officers unless they first put into evidence evidence that they are going to pay it themselves. So our position was that when they put into evidence that they were, in fact, going to pay it themselves and gave the jury the impression by talking about this would hurt their college education, this would hurt their income, and when they put that into the record, it's our position at that point we're allowed to come in and present evidence, which we felt we had, evidence that, in fact, they were going to be indemnified and their personal income really wasn't a factor. Well, the indemnification, though, unlike some of the other cases, is discretionary on the part of the city. Am I right? It is discretionary. And that seems to be what the trial judge thought differentiated this situation from other situations when she concluded that it wasn't relevant because it asked the jury to speculate. Will they or will they not be identified? Now, what's the matter with that determination? Well, the argument we made was we had actually uncovered in the couple of days beforehand. Yeah, yeah. Did you make an offer of proof with respect to all that? Yes, we did. And how did you do that? We made an offer of proof that we had a councilman and... Did you have a declaration or an affidavit? No, we did not. What we asked is that we be allowed to bring them in as an offer of proof, put them on the stand, because we had information. We don't know that it was accurate, but we felt it was accurate. They had already made the decision that had been discussed in council meetings that they were going to indemnify. They had made that decision already immediately after the trial. What the court may recall is there was a mess-up. The jury jumped the gun and actually awarded punitive damages. Right, put a million. So we actually set the trial five to six days later. It was our understanding from our source in the Glendale Council that they had already made, between the time the trial ended and the time the punitive damage phase came in, they had already made the decision to indemnify. Is there an affidavit or a declaration or some kind of anything in the record at all that proves that other than you saying it? We can't. We offered to put a witness on them. Did you prepare a declaration or an affidavit for signature? The person who was our source was basically a source that was not willing to go on record. Well, you see, now the bottom begins to fall out of your argument. Now you've got a source that won't go on record. Well, the source was in essence saying, call this person. What does in essence mean? The person said to us, call this person as a witness. We subpoenaed the person as a witness. We offered to put them on. Let me cross-examine and tell the truth under oath. Have you chosen to do that? Well, if this gets to be tripled speculation now, you've got a source that won't even be identified. You've got no documents one way or another. Well, we feel like if we'd have been given the chance to put him on the stand, he would have told the truth. What you feel like is a wholly different problem from some source who won't be identified, tells you, do this, and you might find a pot at the end of the rainbow. We weren't given the opportunity. What was your offer of proof to Judge Snyder? Our offer of proof was that if he was put on the stand, we believe he would have testified that they've already made the decision to indemnify the officer. What do you just qualify with, we believe? Wouldn't you have made it clear? Why wouldn't you say, to put him on the stand, this is what he will say? Because again we believe this is what he'll say. It's kind of a little wishy-washy, isn't it? It is. And frankly, as I've said, it came from a source that we could not identify, we were not allowed to identify. We believe that that's what would have happened. We thought we should have been given the opportunity. Did you ask for a continuance? We've just stumbled across something that's extremely important in this case, and we need time to go investigate it? We didn't. We actually had a witness. When did you get this source? Who was the witness you offered? I'm sorry? Who? You said you had a witness. Who was it? The Glendale Councilman, one of the Glendale Councilmen. Did you talk to the Glendale Councilman before you were intending to throw over that person on the stand? Actually, we didn't want to talk to him beforehand because what would have happened is we believe he would have prepared an answer. What I wanted to do was put him on the stand and surprise him with a question so he would answer the question faithfully. You were fishing. Well, I think I was. You were hoping. This is not an offer of proof. Well, they had a Glendale Council meeting. We knew that. We had a source that was at the Council meeting who told us it was stated, so we were doing more than I think fishing. Was the source an official Council person of some kind? He was somebody who worked in there and who was in the meeting. That's what we heard. That's why we felt I didn't want to put him in a situation where I told him ahead of time what I'm going to ask him and let him prepare his answer. So it's not an offer of proof because you don't know what he was going to say and you expected him to lie. We expect him to tell the truth. If he's caught on the stand, we hope they will tell the truth, sure. Absolutely. So I'm not sure. I can't find the transcript on that ruling. So what exactly did she rule? She said the Second Circuit case, a right to require indemnification, indemnification was relevant. Here we don't have those factors present. And I think whether or not there was indemnification is something that is not relevant to the facts of this case. That's correct. Isn't that an abuse of discretion standard? It is. Okay. In conclusion, I'll just end by saying I recognize this court, obviously, in situations with police officers, there are situations where they have to make split-second decisions, where there are cases where they're questioned. I do understand that there's obviously this thing called Monday morning quarterbacking, where you go back and you start questioning everything, every move they made. But in truth, every case we do, whether it be criminal, civil, is in essence Monday morning quarterbacking. That's what we do as lawyers, judges. That's what we ask juries to do. The crime has been committed. The case has happened. We now come back later and say, okay, tell us what you think should have been the result of what you think these actors should have done. So in essence, every case amounts to that. This is no different. In this particular case, however, they had the opportunity to investigate the evidence overall, the totality of circumstances from the time they arrested him. And I think this is critically important. From the minute they arrested him, not one single piece of evidence arose. Despite huge resources, huge amount of time, a devotion to this case, not one piece of evidence arose that tended to implicate him. In fact, everything just kept exculpating him, and they just kept ignoring him. Mr. Obsepian, unfortunately, the famous saying, I believe it was Mr. Sullivan, the Reagan administration, was famous for quoting him. Where do I go to get my reputation back? And the problem here is not jail. I mean, sure, jail is not a wonderful thing to sit through for eight months. The problem is, is his name was splashed on the Glendale and L.A. Times. That was the Secretary of Labor who said that. That's right. It was splashed on the Times and the Glendale Press. From this point on, every person who Mr. Obsepian, or a lot of people, I should say, who Mr. Obsepian will run into will simply think he's a killer, will think he's a criminal. He hired a high-profile lawyer. They'll think he just got him off. Did he try to get a declaration of actual innocence out of the court? I don't believe so. No, he didn't. You know, there is that possibility under the penal code. There is. There is. I know that the I don't want to give legal advice, but it's something you might want to look at if that's what you feel. I know that at one point, Deputy Novice, the District Attorney, was approached on it and discussed to see, because occasionally the prosecution will concede to it. Well, if occasionally judges won't pay any attention to the prosecution, we'll issue one anyway. True. But that doesn't mean you shouldn't try. No, absolutely. Absolutely. All right. Thank you, Counsel. Thank you. You're actually over your time, but I'll give you a couple of minutes for rebuttal. We want you to address, at least on the cost appeals, I think Larez is controlling here for the reason that it is optional under the government code law to identify here. That's different than the Bell v. Clackamas case. Well, Larez, though, was in a different context. It was whether the whole thing could come in initially. It didn't discuss whether it can be brought in after it's raised. Yes, but the analysis of Larez, which is all it would do would inflate the award because you don't know if they're going to be indemnified or not. I think that's the situation we have here. Well, is it? I mean, you're the lawyer representing the city. I mean, had the city decided to indemnify the police officers? Not to my knowledge, no. No indemnification decision was made until after trial. Yeah, that's what your opposing counsel said. That's what the record is. And, again, the offer of proof here was simply we're going to call this counsel person, we're going to call the city manager. They didn't do discovery on the question. We don't even know what the city's prior indemnification practices were with respect to police officers, and we've certainly seen cases where plaintiffs go forward with that. The Tribunal v. Gates example. Let me switch gears for a second. Can you tell us exactly what Carmen told the police about the robber's connection with the tile work? She, I agree with the opposing counsel, she initially was like we have a lot of boys over. She then started, slowly kind of dawned on it. There were like three separate interviews where this was teased out of her. And she started saying the one, the young one, looked like a guy who did tile at my place. She didn't know the guy's name. We had to talk to her other son, Sabon, and ask Sabon. Did she say it looked like the guy who did tile at my place or the guy that did tile at my place was one of the robbers? The more she, it's along those lines. It looks like the guy that did the tile at my place. It looked like him. Did she testify at trial on that subject? At preliminary hearing. She did not testify at trial, no. Not civil rights trial. She testified at the preliminary hearing of the criminal trial. Okay. There was a criminal trial? Of the criminal proceedings. At the prelim. Just at the prelim. Is that in the record someplace, the excerpt of record, her testimony at the preliminary hearing? No. No. That didn't come in. That didn't come in. And we didn't try and get her testimony in via that, no. But she did identify. Wouldn't that be helpful on qualified immunity if she told him it was one of the tile workers? Well, yes. No, but those statements came in. Maybe she didn't say that at the preliminary hearing, and maybe that's why he didn't go to trial. Well, he didn't go to trial because DNA linked somebody else who confessed and said he didn't know him. I mean, that's why he ended up not going to trial. For all this talk about how good the alibi evidence is, bear in mind the district attorney had all of this. You know, there's a short dispute of what she had just before filing charges, but she had it days after. So are we unable to tell from this record exactly what she told him about the tile worker and the tile worker's connection with the robber? No. It's in the record. It's in the three interviews that we have with her. We have the transcripts are in the excerpt of record. We also have the audio of those interviews. Those are the disks in there. So you can listen. You can hear her as she teases out that story because it was something that kind of dawned on her. Oh, yeah, now this is the guy who did tile at my place. I don't know him. But she never said this is the guy who did the tile at my place is the guy who murdered my son. Well, she says that's what she starts to say. He looks familiar. But that's not the same thing.  Look at the statement. I've read the statement. I haven't listened to the audio tapes, but I have read the statement. She never says that. As I understand it, she said at most one of the three. Yes, one of the three. Looks like this guy. Yes. As a matter of fact, wasn't it a fact that that one of the three wasn't even the shooter? The shooter was number two, one of the other two guys. It could be. Didn't they make an arrest later and get convictions? I'm sorry. They made an arrest later and got convictions. I don't know the stats of the other criminal trial. All right. But apparently she didn't identify the shooter. She just said that one of the three guys looks like this. Yes. But they're all liable for the murder. I mean, they're all participating. So if the Court has no further questions, I would submit the matter.  This case, Vespian v. Glendale, is submitted. We have already submitted Live by the Park, Palm Springs v. ARC Specialty, and Yalter v. Federal Insurance Company. So this session of the Court will be adjourned for today.
judges: Brewster, Trott, Wardlaw